The next case, we'll hear from the tellers. In this case, it's the VeriSign case. Thank you and may it please the court, my name is Lisa Blatt and I represent VeriSign. This court should reverse the decision below because for each element under the Lanham Act, the district court misapplied the law and repeatedly overlooked more than ample evidence to defeat summary judgment. As to the first element of falsity, XYZ advertised that it had the most sales of any new top-level domain. Yet, on day one of its business, XYZ began stuffing 375,000 domain names into users' accounts without their consent, much less payment. Advertising that a giveaway is a sale is literally false on its face. Yet, the court below... I was given it, I would set out what the general situation says, this is where this argument is going, one, two, three, and four, and then go right down that list. I'm pivoting to your approach. So the elements of falsity, materiality, deceptive, and injury, I hope I got all my elements. Yes, and so what I was going to do is take you through each of the elements and in seriatim, go through the categories of false statements. I'm first starting with the legal error the court made, and then I talk about the evidence that was... I'm going to start out, basically take the land on that, look what false advertising requirements are, the claims to prove, and then go down each one of those requirements, and then you're going to tell me why. Right, and the reason I did this, because this is a very fact-dependent case, it's also the exact order the district court did. The district court took each of the elements, and almost, I guess on all the elements, there was a threshold legal error made, and then the court just overlooked, in some cases, an avalanche of evidence that would defeat summary judgment. Now, let me give you one more road map. Judge Harris, sorry. I had to make a whole chart, right? Me too. You have the elements, and then you have, oh, here it is. And then you have the statements, right? And don't you need to find, like, one statement that hits all five elements? You can't just sort of toss them all in in one statement, right? Right, so what I was going to, you can't mix and match categories. So, the other thing I was going to say is our brief has three categories of statements, and I don't think you can take, and it's basically they both falsely touted their own product, and then falsely maligned our product, and I don't think you can mix and match injury or materiality on that. So, the three categories of statements are, there was false misrepresentations as to the number of sales and registrations, and then we allege materiality, deception, and injury. And then there's the lie that XYZ was dubbed, NPR dubbed it the new dot com. That's exact same level of injury, but materiality and deception is a little different. Do the same thing with that one, and then the availability statements do the same thing. That's what I was asking. Why don't you just lay it out? I said we got these three different types of statements. Popularity, availability, next time. And then we got three ways, which is going to look at each one of those three. This is how I'm going to proceed. Yeah, this is my first summary judgment case. So, I'm a novice, and I appreciate the education. No, I do. And it is, to craft a, what we call a spiel was quite difficult. All right, so let me go with the sale. Well, one of the things, I want to get my mind about your argument about proving the five elements. You're asking us to adopt the presumption of materiality, and my question to you, doesn't that conflate the elements of deception with the element of materiality? Yeah, I mean, that's the reason three circuits have rejected it. Two circuits have gone that way, so we were going to make the argument. But because the evidence of materiality is so devastating and overwhelming, that it's just a much easier path to victory for us, and I wasn't even going to mention that presumption. Because the evidence of, and again, on all three categories, and I could address materiality first, but it is so overwhelming. The only argument that what I would think would support the fifth circuit's presumption of materiality, and I see what you're saying about the overlap with deception, is that it's sort of like, well, why did you do it? You obviously made that literally false statement because you thought it was going to affect consumer purchases, and that is true in this case. But I think it's better to go through the evidence that gives rise to a reasonable inference. And if I were the fourth circuit, you just don't have to address it. So on the end, the other thing, Judge Winn, is we started with the most powerful lies, and the ones where the evidence was so strong, and that was on the number of sales and the number of registrations. The court didn't even address the misrepresentation of the sales. All the court said was that XYZ truthfully advertised that it had the most registrations. And here's the legal error. The court didn't even look at whether touting and sort of cheering the explosion of registrations necessarily or misleadingly implied that users actually paid for those registrations. But aren't you just quarreling with the business tactic of your XYZ? No. No, and that's why, I mean, 63% of all users surveyed found it deceptive. If someone tells me that a shirt is the top-selling or a book is the top-selling book, it cracks the system. The whole point of a top-level domain usage is to have it popular and immediate success, and the whole point here was to create a gold rush. And the reason why is that users and people like me have trouble remembering stuff, and they want an easy, kind of catchy domain name. And if everyone is using XYZ, just like everyone uses .com, it helps your business model. It's critical to the value. So it's not a quibble if a competitor doesn't like it when a new entrant lies about its success and at the same time lies about what a reputable news organization said about it and then lies about its own critical features of availability. So, Tara, did you have a question? Oh, go ahead. Okay. All right, so on the element of falsity, we talked about the legal errors. The court also acted as a trier of fact and ignored powerful evidence on a motion for summary judgment. And let me give you the best example. The court held that XYZ truthfully advertised that web.com paid, quote, unquote, a fair value $8 wholesale price, but there was expert testimony and record testimony saying the exact opposite, and a jury could easily infer from that evidence that the web.com transaction was a total sham. The court also said that NPR, and I'm quoting the court, did, in fact, describe XYZ as the next .com. But the transcript, of course, says NPR said no such thing. Judge Harris? Yeah, the NPR said thing, I just, I mean, it just seems like it wasn't quite the next, it didn't really say it was the next .com, and the, I mean, I looked at the blog post, and it says we implore you, listen to the whole interview. It gives a link to the interview. They're obviously not trying to, I mean, they're not hiding anything. They want the people who read the blog to listen to the full interview, which would give them the literal thing that was said by NPR. I just feel like, isn't this making a kind of a big deal out of a very little? No, there's only one site that links it, and he repeats and misstates what NPR dubbed it over and over. And the reason why it's significant is that if NPR dubbed someone the next Warren Buffett, I mean, obviously, and I can guarantee you, people are more likely to invest their money with you. And the court, I mean, the NPR reporter didn't say. All here, I think it was a she, said is not even Nagari, just new entrants, of which there were 2,000, are going to try to become the next .com. And that's, it's like saying someone, a person could try to become the next Michael Jordan, and the difference between that and saying, oh, no, that person is the next Michael Jordan. It's a huge difference. And if somebody dubbed me the next Clarence Darrow, I would like that, and I would advertise that, as opposed to Lisa Blatt, which is going to try to be successful. Isn't there a distinction, though, between sales to consumers and sales to registrars like web.com? Sure. In terms of, though, which element, the XYZ lied to everybody. It lied on its blog post, on the web. It misrepresented its sales and registration and the NPR figure to actual registrars in China, Japan, Google.com. And the web, yourself, and your blog post is to the world in general. Industry watchers, industry reporters, and advertising for awards. So it's kind of all over the map in terms of the dissemination, and I think the intent, if you look at the evidence, their intent was to deceive everybody and anybody in order to create the gold rush and get people to actually buy their product. That was their business plan. Do you see how long this could take? You just discussed the next .com statement in relation to the falsity of it, which is the first element of it. I've got five of them, and there are three on each one of those right there. I can see getting ready to happen here. You're not going to be able to finish this. Right. Well, and that's why, I mean, if you look at the brief, you know, two-thirds of it is sealed because it's so evidentiary-based, and I could limit this to the legal argument, but in so many instances after instances, the court just overlooked evidence on injury and deception. But I'll go straight to the legal error. Materiality, I think it's just a- One element of the length. Yes. Materiality. Now we're going to discuss that in the context of which statement. I can do all three. All right. The easiest one is the misstatements as to the sales and registrations because the evidence was overwhelming that the minute users, the press, and industry watchers found out, they were outraged, they complained, and they immediately stopped buying their product. And there's sealed testimony all over our brief where XYZ admits that the whole point of this and that consumers obviously care about success. Can I ask a question? Because, I mean, you really do have to show not just that popularity is important to consumers, but that it's important to consumers that the popularity be based on sales rather than giveaways. It's not just that you want to know that a lot of people are using this name, they want to know that a lot of people paid for it. And you had that survey out there that talked about the difference between those two things, but it didn't even ask about materiality. That's the obvious way to show materiality, and the key evidence seems like it's missing. No, no, you are right that the survey was proof of deception. Judge Harris, the evidence of materiality is so overwhelming. Well, where is it? I know there's that one customer who says. Oh, my God, we can't say the names, but it's more. It's the press who told them you've lost the. But materiality has to be consumer based. Consumer purchases. You have to know how it's at the consumer. And registrars complained. One bulk reseller, so he buys hundreds and hundreds, said, I'm stopping buying cold. I'm done with you. This is a summary judgment. I would go to that with a trial. That's pretty smoking gun evidence. Well, I know it's a summary judgment, and I know it's a factual question, but is the standard of materiality really, if you can find one consumer for whom this was material, that's good enough? Could a jury reasonably infer, and I don't know about one standard. If he's a bulk reseller, if the industry is complaining and the evidence is overwhelming, the only point of doing this was to create a gold rush to increase its sales. They admit over and over in their testimony, XYZ employees, that this affects consumer purchases. Popularity, yeah. And acceptance and sales. The more likely, the more successful, which is not popularity, but it's related. The more successful you are, the more likely people are to buy your product, and that's just acceptance. It's like I'm not going to be the first person out there that buys p-2.com, but if I hear everybody has the new XYZ, which is the new .com, yeah, I'm going to pick XYZ over PQR or CDE, .CDE. You were not trial counsel, right? You don't know why they didn't survey them? Survey materiality, I think they had an avalanche of evidence, no. I think the survey just would have said, would this affect your purchase? I haven't done that many of these cases, but yeah, that's exactly what you're supposed to say in the survey. I think no, but Judge Harris, even on the .com's availability, again, I do think the Warren Buffett example is a great example. This is a classic fraud in consumer fraud. Juries are allowed to use common sense, and when the point of your gold rush, a lie, is to actually get someone to buy your product, it's not that big of a leap for a jury to find it was material. Materiality just requires that it's likely to influence consumer purchases, and this is the nature of the industry. On .com's availability, Mr. Nagari and two sealed sources said that consumers care deeply, and by the way, this is the flip side of the materiality for the other thing, that they care deeply about having a easily short .com name with no numbers or dashes, and this is material because they want visitors to its site. And so at the same time they were trashing .com's availability, they were touting their own success, and so I don't know how you have materiality under one and not the other. This is my last question. Can I just ask about materiality and I guess also deception on the unavailability of good .com sites? Does it factor in at all how easy it is to verify that? Like if I'm a consumer and I see something saying, oh, you can't find any good .com names anymore, 99% of the searches come back no, but there's a name I want, why wouldn't I just type it in? It takes two seconds. It's so easy to verify whether you get the name you want. You could probably verify if lisablatt.com is existence, but when I went on to VeriSign's website and thought, okay, let me see, it looked like a nightmare. Oh, that's so funny because I did it. Did you do that on VeriSign? And it took like two seconds. It was not available. You tried to register that on VeriSign? I don't remember which site I was on, but it was easy to find that it was taken or not. More sophisticated than two million people. All right. We'll hear from the other side. Good morning and may it please the court. My name is Derek Newman. I represent XYZ.com and Daniel Nagari. This court should affirm because VeriSign has failed to show a genuine issue of material fact for all of the five elements of the Lanham Act. And as this court pointed out in Design Resources, Inc. vs. Leather Industries of America, the failure to show just one element has failed to VeriSign's claim. I'd like to focus on four independent reasons why this court should affirm. First, no statement at issue was contained in a commercial advertisement or promotion. Second, no statement was false or misleading. Rather, every statement was true, opinion, or public. Third, VeriSign has failed to show any evidence of a connection between a And fourth, VeriSign has failed to establish any evidence of materiality, namely that a consumer is likely to make a purchase decision based on any statement. I'll start with the first, which is no statement was contained in a commercial advertisement or promotion. Each circuit that has considered commercial advertisement or promotion, which is a requirement under the Lanham Act, has found that a commercial advertisement or promotion requires either that the statement be widely disseminated in the relevant industry or the Sixth Circuit recently found in Grubbs v. Sheekley that it could be to a substantial portion of an existing customer base. Under either standard, no statement here is commercial advertisement or promotion. VeriSign admits that the relevant industry is tens of millions in the United States alone, hundreds of millions worldwide. And the most widely disseminated statement, which was this two cars video, which contained only true statements and opinions, was distributed to 52,000 people. In fact, I shouldn't even say... Looking at the Gordon Breach out of the Southern District, those factors that are situated there in making this determination, but when you put this online, why is that not wide dissemination for commercial purposes? Well, Your Honor, as VeriSign admitted, Google analytics and YouTube views are precisely knowable. So it's not a circumstance where it's put on the Internet and we don't know how many people viewed it. Here, the YouTube video, the one that received the most views, was 52,000. There's no evidence in the record that a single one of those 52,000 was part of the relevant purchasing public. But even assuming that every single one of them was, it's not even a tiny fraction of the tens of millions in the United States, hundreds of millions worldwide. So is viewing different from dissemination? I mean, you disseminate it, and now we've got to go and determine who actually viewed it? Is that held in any court? Yes, Your Honor. Each of the courts that have reviewed commercial advertisement or promotion have done an analysis. For example, the 7-Up case in the Second Circuit determined that the market was 86 bottlers. It reached 11, that's 15%. Verisign cites this Neuros case, which found that engineers are the salespeople. The 7th Circuit says that this whole issue is determined that it varies according to the industry. Yes, Your Honor. Your industry has to do with dot-com. This is not 7-Up. So it's a whole different ballgame. You put it on the website, looks like widespread dissemination to me. Will someone use it or not is another question. I respectfully disagree, Your Honor, because if it's just placed on a website and no one sees it, it's not widely disseminated. You'd have to prove that one. No one saw it. No, Your Honor. The plaintiff has to prove that because the plaintiff bears the burden of showing commercial advertisement or promotion. You put something on the website, and you want us to presume that no one saw it. No, Your Honor. That's essentially what you're saying, right? No, Your Honor. The evidence is clear. For each of the statements at issue, we have specific data that shows how many people saw it, and that is the extent of the dissemination. It could only be disseminated to people who are exposed to it. Can I ask you a question? I did find this issue very interesting, and I did look at a lot of the cases, and it does seem to me that you are right that sometimes the courts really do look at evidence of receivership or viewership. But that seems to be mostly at least in cases where you're looking at something that is not a traditional advertisement. But are there any cases where someone runs a TV ad on a network and courts have trouble deciding that that is an advertisement because maybe not enough people viewed it? I would think that when it comes to something that is common sense, traditional advertising, I'm not seeing a lot of cases where there's an emphasis on how many people actually saw it. It's in the nontraditional promotion cases, like, well, we sent out a bunch of letters to our clients. That's when you start looking at how many people really viewed it. Is that not right? That is correct, Your Honor. Okay, so you are not arguing that if they had run this YouTube ad on NBC, we would be sitting here arguing about how many people saw that ad? That's right, Your Honor. So why should YouTube be different? Because with YouTube, we know precisely how many people see it. We know how many people watch NBC, too. I mean, boy, that's NBC's whole economic model, that they can tell you how many eyeballs they're delivering. And that's why there's never a discussion of how many because when it's on NBC, we know that there's millions of people. But you're not going to spend a lot of time on this issue because injury wouldn't exist even if we did find it to be commercial under your scenario, right? Well, Your Honor, as to injury... If we determine, yes, commercial, but then nobody saw it, you're going to win, right? Yes, Your Honor. You're not going to spend a lot of time on this issue, are you? No, Your Honor. I was going to move on to injury. And specifically, in order for VeriSign to succeed, VeriSign must show a causal connection between deception of consumers and loss to VeriSign. The Supreme Court Lexmark case is very clear that in a false advertising case, there has to be deception of consumers that causes consumers to withhold trade from the plaintiff, in this case VeriSign. VeriSign has no evidence of any injury. In fact, the only evidence that it submits is an expert who the district court excluded under Daubert, and for that this court reviews under an abusive discretion standard. The expert took all the new competition in the marketplace, about 650 new top-level domains, and applied XYZ's market share to the alleged loss in .Net, and by applying the market share, determined how much XYZ was responsible for. In doing so, this expert, the fatal flaw that this court called out in PBM, namely, she assumed that every single sale was due to false advertising, not a single sale due to legitimate advertising or for any other reason. Because by taking its entire market share, that assumes everything is false advertising, otherwise it would be less than the entire market share. The district court, following PBM and for other reasons laid out in the opinion, excluded that expert opinion, which again this court reviews under abusive discretion, and VeriSign has no other evidence of any injury. There isn't anything in the record that indicates that a single sale was withheld from VeriSign in favor of XYZ or otherwise, and for that reason, there is no genuine issue of material fact as to injury. Well, it seems to me that if we agree that the district court properly declined to credit the Kindler report, that was on the diversion theory of injury, is that right? Sales were going to XYZ instead of .Net, but what about the kind of more general reputational harm, which I gather would be the claim with respect to the unavailability statements? VeriSign has no admissible evidence of loss to reputation or goodwill. The only evidence that VeriSign suggests the court should have considered is testimony from its vice president of marketing, Scott Schnell. He renders an opinion on behalf of VeriSign. He speculates that there's harm to goodwill. He was not an expert. He was not an expert, Your Honor, and under Rule 701C of the Federal Rules of Evidence, a person is not allowed to opine about matters that require experience and specialized knowledge, unless that person is an expert. Schnell was not qualified as an expert, and of course the plaintiff in a false advertising case is going to speculate that it suffered injury. That's speculation and conjecture, which this court in the design resources case said is not sufficient to overcome summary judgment, and so the evidence of VeriSign's own opinion about suffering goodwill is insufficient. There's no other evidence in the record that VeriSign suffered any other harm. Do you have an expert on reputation and goodwill? No, Your Honor, because XYZ didn't bear the burden, and the first we heard of it was towards the end of discovery when VeriSign's corporate representative claimed that the sole evidence for loss of goodwill was his own opinion, and so we didn't need an expert to rebut what VeriSign had the burden to show. Well, first of all, when we get an injury, we determine in favor of VeriSign on other issues, so what about corrective advertising? If they establish they went out and ran these advertising there, correct something you did, what about that? Corrective advertising, Your Honor, and the cost of it is a remedy. It's not a fact-showing injury, and the reason that we know that is because Lexmark, and this court in the Balmora case repeated the Lexmark standard, requires a withholding of trade to VeriSign, harm to the plaintiff, and until there's harm to the plaintiff where sales are withheld, then the plaintiff recovers nothing to the extent that— It is a remedy, but the damages that arise from having to pay for it seems to me to be an injury. If they have to pay for it, that's an injury. It is not an injury, Your Honor, until VeriSign— Well, let's say a color damage. They paid some money for this corrective advertising. The case law is pretty clear. They're entitled to that now, aren't they? They are not, Your Honor. If they can establish that they did it to correct something you did. No, Your Honor, they're not. First, VeriSign must meet each of the five elements for false advertising, one of which is harm, and to establish harm, VeriSign must show that consumers withheld trade from VeriSign. Until VeriSign shows that, VeriSign is not entitled to recover anything. I thought that—I thought—but tell me, I may be misunderstanding this. I thought corrective advertising was like a way of calculating damages for the reputational harm that you have shown. If you've shown reputational harm, it's hard to quantify. One way to quantify it is here's how much money we had to spend to fix the problem. Is that not right? No, Your Honor, because of the Lexmark case and this Court's Balmora case. The cases that Your Honor cites exist, but they were decided before Lexmark. We now must look to the Supreme Court standard that there's a withholding of trade to VeriSign. So it's also a way of calculating diversionary. I don't—no? I thought the Alpo case from the D.C. Circuit says you can recover the cost of your own advertisement when they actually and reasonably respond to the defendant's offending hands. That's correct, Your Honor, but not until VeriSign establishes harm, which is— Well, that's what we've got in the whole business of—I said we're going to talk about this, and this is assuming we've already reached that part of it. We're going to get back into the whole business of whether it meets the elements of the Lanham Act. That's a whole different ballgame. All right, Your Honor. So to the extent that VeriSign has established harm, the consumers withheld trade from VeriSign, VeriSign can only recover corrective advertising damages if they could show that the corrective advertising was responsive to the statements at issue and that it was reasonable. Here, VeriSign ran a contest to dispute the notion that there's lack of dot-com availability. VeriSign admits that it has been battling that notion for years, at least 15 years before XYZ entered the marketplace. There are documents in the record that the court can review before VeriSign ran the contest and after VeriSign ran the contest. None of those documents state anything about XYZ or a single statement that XYZ made. Talk about the popularity of the statement. It was one where you went out and got someone to, I guess, basically purchase some kind of a deal where you traded. You didn't really—I don't think any money actually was exchanged. It was very little. About three-something million dollars worth of stuff was bought. 350,000 domain names picked up. Then he goes out with the domain names and calls up folks like starbucks.com and says, hey, would you like to have starbucks.xyz? Of course he would. So he takes it. So you do 350,000 of those and then you go and represent. Well, we have now sold 350,000 to 600,000 of these names. And, you know, in terms of whether that is false or misleading, literally false or deceptive in another element of it, I mean, that's—explain that to me. Explain why that is not a false, literally false statement. Because, Your Honor, that didn't happen. XYZ and the court should review the record. You didn't go and make an agreement to sell 350,000 domain names. That didn't happen. That happened, Your Honor. What didn't happen is a public statement about sales until— Well, let me make sure I got all the facts up to the public statement. You got that happening. 350,000 were actually sold. Yes, Your Honor. And then—and they weren't sold for like actual cash. It was sort of like an interest type thing. And then the 350,000 were basically given away. False or not? True, Your Honor. True. Given away. What's the representation that's being challenged here that you made? There are two representations being challenged. One is that when XYZ said the number of registrations it achieved, that that's misleading. But VeriSign admits it's true. The number of registrations that VeriSign—excuse me, that XYZ achieved, it actually did. And VeriSign doesn't challenge that. It admits it's true. The second, we heard an oral argument moments ago that VeriSign made representations about sales. But, again, I point the court to the record. The only representations about sales were made in three one-off emails, each to a single person, and then a blog post that was made in December of 2014. By that point, XYZ had achieved more sales than any other top-level domain, even if you exclude the 350,000 that Judge Wynn references web.com giving away. Did you make a statement that you had sold over 600,000 domains? I don't believe that was one of the statements, Your Honor. And if it was, it was in a one-off email to a single person. It was in the record, page 640. Did you make a statement that you were the number one TLD? Yes, Your Honor, because XYZ was the number one TLD for lots of reasons. Because you had sold 600,000 domains, right? Not— That comes from this 350,000 given away. I'm not arguing. I'm just asking you is that—the record's right here. I'm glad the question's in the record. XYZ was number one for multiple reasons, one of which was it sold 600,000 domain names. I want you to read it, too, to make sure you respond so we can talk on this and get to the real issue. Because I know this is not the ultimate issue. This is something we need to establish, though. XYZ sold 600,000 names, 350,000 of which it sold to Web.com. Web.com gave those away. But even if you exclude the ones given away, XYZ still sold more than any other new top-level domain. There's no evidence in the record that indicates otherwise. Therefore, XYZ sold the most. But XYZ was number one for other reasons. For example, in the record, the Court will see the blog post by Daniel Magari. Did you make the statement that you were the largest, fastest-growing new domain extension? Yes, Your Honor, because it was true. And make that statement based upon, again, that 350,000 given away? Only in part, Your Honor. If you were to exclude that, XYZ was still number one, and nothing in the record is contrary to that. The burden of showing a false or misleading statement is on their side, and the record doesn't indicate that any of those statements were false. And because of that, XYZ was number one. So you're saying it literally was true? It was literally true. And Daniel Magari — Was it misleading? Ask the question. It was not misleading, because this Court in Design Resources, Inc. versus Leather Industries of America, which, again, I think is the precedent that this Court should review for lots of reasons, found that if a statement requires consumer inference, or if it's a mere suggestion, that it doesn't qualify as false or misleading under the Lanham Act. The statement that XYZ achieved a certain amount of registrations, which is literally true, does not give rise to the idea that every single one of them was sold by Web.com or other third parties. The truth, which we know from the record, is XYZ did sell every single one of them to Web.com and to others, and that it achieved the number of registrations which it stated it did. This Court in Milan found that a failure to state — Can you sell it to one entity and then say, I've sold more than anybody else? I mean, could you sell them a million to Web.com? They'd give them all away. Then you say, I've sold more than anybody else. It's like the New York Times bestseller list. Yes, Your Honor, under that hypothetical, yes, but that's not the facts of this case. It's literally true, but is it not misleading? It's not misleading unless there's evidence that consumers will review that statement and come to a conclusion that isn't expressly stated with respect to the statement. And here there's no evidence of that. But Your Honor just raises a hypothetical because the domain names weren't just sold to Web.com.  I guess that's what you're saying, right? I don't know exactly when the statements were made about statements, but sure. $350,000 out of $600,000 at the time that they were made. The majority was sold to Web.com. They were nonetheless sold. Sold it and then said, I will, the largest and sold more than anybody else. Yes, Your Honor, but even if you exclude the Web.com, XYZ still sold more domain extensions than any other new domain extension. Was there anything wrong with trading websites for advertisements? Anything illegal about that? Of course not, Your Honor. Web.com provided for XYZ advertising on websites like the New York Times and Sports Illustrated, which generated millions of web impressions to XYZ's website, and none of them reached any of the web pages at issue here. And VeriSign is not challenging legitimate advertisements that Web.com placed for XYZ. VeriSign is challenging random statements in one-off emails and blog posts that reached a few hundred people at most and a YouTube video that reached 52,000 people, but even that YouTube video only contained XYZ's opinion about what consumers want because, of course, what somebody wants is subjective and may change from day to day. Thank you. We appreciate it. We'll hear a brief rebuttal. So on the record sites for where the word sale is used, the 640, JA640, is a Las Vegas radio interview. It's not an email. It's actually on the radio. And the SA553, which is right after the giveaways, they used the word sale. They also used the word sale at JA693, 694, and sealed appendix 354. And, Judge Floyd, the evidence, we don't really need to convince an appellate court judge of anything other than a triable fact issue, and there was an expert that was not excluded, just ignored. There was nothing about his reliability that said it was false. So this is the expert who said this was a sham. Didn't that expert have to assume the falsity of all the statements? No, it had to assume it was, well, the only thing the expert testified was 375,000 giveaways. I'm sorry, what? You get where I'm going with that? You've got to prove specific falsity. You can't say, I assumed everything was false. Sure, and the literal falsity, we had a survey where this court has held even 50%, 15% of confusion. The expert can't do that. The expert can't start with that assumption. It's got to give that specific, take it from that specific. Right, Judge Wynn, there is ample evidence that consumers were misled. The intent was to mislead. The transaction was structured to mislead. I've got that. I'm just dealing with it from the perspective of this expert testimony. The expert testimony just said this 375,000 swap was basically a sham. Nothing, no money exchanged hands. And you can't pick experts. The district court didn't even mention the expert. It didn't even mention it. It just said, I find it as fair value. He basically acted as the jury. This is a classic easy case of a court just not applying the summary judgment standard. I think I understand that distinction you just made. You don't or do you? I do. Okay, so let me get to injury, which was. It's important because even if it is commercial, what it seems like the opponent is saying is that even if you win, there's no injury. Right, and there was four elements of injury. And I'll start with the one thing he didn't address was disgorgement because the court made a grotesque legal error saying that disgorgement requires a link to the plaintiff's damages. Well, that's a new one in the history of the law because it's obviously linked to the defendant's profits. It's never been linked to the plaintiff's damages. And there's just we're entitled to disgorgement. So there's a reversible error on that. On corrective advertising, case after case says the point is it's prophylactic. You're allowed to spend corrective advertising to prevent the diversion of sales. His Lexmark argument was frivolous. That court said nothing about you need to show a diversion of sales to get a different element of damages. Can I ask you, because I feel like I've lost the thread now on corrective advertising. Sure. So, but you're not saying, right, it's a form of relief if there has been Lanham Act injury, right? It's not a way of showing injury. There has to be injury. And if there was injury, then go ahead, run the ads, and we'll give you. If you mean by injury, you know, injury in fact under Article 3? No, no. I mean Lanham Act. Reputational harm. Reputational harm. But you can't show reputational harm by showing we ran ads. No, no, no. You're absolutely right. You don't need to show a loss of sales before you spend the money. You have to show reputational harm. But you can't point to the advertising as evidence of reputational harm. No. The marketing guy who testified that this was a response, a Third Circuit case said that's absolutely persuasive testimony. But you have shown the reputational harm. Right. And their only argument is that we had to have an expert on that. Right. And they don't cite a case for that for a reason. So you just don't need an expert. Of course you don't need an expert. Again, that argument is absurd. He's the Vice President of Marketing. It's like getting Coke's marketing expert to say when someone said we had bugs in our drink. But he can't give his opinion on Goodwill. Of course he can. And, of course, the jury's entitled to rely on common sense. Plus. Marketing expert's opinion on Goodwill is going to be admissible. Reputation that when you trash my product. He's not an expert. He is an expert in the sense of it's his job. He's not an expert in the sense of the federal rules of evidence where you get a dauber hearing. He hasn't been qualified. No, he wasn't introduced as an expert. He can give his opinion, a lay opinion. Absolutely. Just like the Third Circuit credited it. Absolutely lay opinion. Absolutely not expert. Marketing executives are the people most well positioned to know that when you say my product doesn't work, that that affects, it's beyond common sense. If you say our product's not on the market, of course that affects your negative advertising. I think a jury could have gone there with no evidence because you wouldn't have been able to take it away from the jury. But we had lay testimony. I think it would be bizarre if you had a requirement you had to have an expert. And this goes to the unavailability statement. Yes. He's testifying that if you hear enough times. Yes, absolutely right. There's also the presumption that if you have a false comparative claim against a direct competitor, you get reputational harm. And we don't think we need to rely on that presumption, but there was that presumption. My time is out, but if you. Thank you very much for your argument. We'll come down and greet counsel and move to the final case of the day.
judges: James A. Wynn Jr., Henry F. Floyd, Pamela A. Harris